UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PIRTHI PAL SINGH, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> SIGNATURE BANK, SCOTT A. SHAY, JOSEPH DEPAOLO, VITO SUSCA, MARK SIGONA, STEPHEN WYREMSKI, and ERIC HOWELL, <br><br> Defendants. | Case No. <br><br> <u>CLASS ACTION COMPLAINT</u> <br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff Pirthi Pal Singh ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, wire and press releases published by and regarding Signature Bank ("Signature Bank" or the "Bank"), analysts' reports and advisories about the Bank, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Signature Bank securities between April 23, 2020 and March 12, 2023, both dates inclusive (the "Class Period"), seeking to

recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Bank and certain of its top officials.

2.      Signature Bank was co-founded in 2001 by Defendants Scott A. Shay ("Shay") and Joseph DePaolo ("DePaolo), along with John Tamberlane, the Executive Vice Chairman of the Bank's Board of Directors.  The Bank relied on a network of private client banking teams and offered commercial banking products and services, with veteran bankers acting as a single point of contact for all client needs.  As it established itself, Signature Bank cultivated a reputation of working with wealthy clients, including privately owned businesses, law offices, and real estate buyers.

3.      As it expanded, Signature Bank began moving away from what had previously been a conservative banking model and adopting a less risk-averse posture with respect to its banking activities.  Signature Bank executives aggressively lobbied for the rollback of several provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act,  12 U.S.C. § 53 ("Dodd-Frank"), a law enacted in 2010 following the 2007-2008 credit crisis, with the goal of "promot[ing] the financial stability of the United States by improving accountability and transparency in the financial system[.]"  In 2018, Defendant Shay argued that it was "ridiculous and unacceptable" that Dodd-Frank's safeguards applied both to large banks and to small-to-midsize banks like Signature Bank.  In May 2018, President Donald Trump signed a partial repeal of Dodd-Frank into law, which raised many of the asset-size thresholds for enhanced regulations from $50 billion to $250 billion, while giving the Federal Reserve ("Fed") leeway to reimpose regulations for institutions between $100 billion and $250 billion.   At the time, Signature Bank had over $45

billion in assets.  In opposing the rollback, Senator Elizabeth Warren warned that the repeal had "set the stage for another financial crash."

4.      By 2018, Signature Bank was also taking significant cash deposits from the growing cryptocurrency industry.  Gemini Trust Company, LLC ("Gemini"), a privately-owned cryptocurrency exchange launched in 2014 by Cameron and Tyler Winklevoss, Coinbase Global Inc. ("Coinbase"), another major cryptocurrency exchange, and Circle Internet Financial Ltd. ("Circle"), the issuer of the USDC stablecoin, all became Signature Bank clients.

5.      Signature Bank publicly embraced the cryptocurrency industry and touted its role in the Bank's future.  On a 2018 conference call, Defendant DePaolo, Signature Bank's Chief Executive Officer ("CEO"), told investors and analysts that "[t]he opportunity is significant, if you're dealing with the right clients," and "[b]lockchain technology is the future[.] [. . .] You don't want to be caught short, *because in five years a number of banks will not be around because of blockchain technology*."[1]

6.      Yet by 2018, the cryptocurrency industry had already proven itself to be incredibly volatile.  Between 2011 and 2018, the price of Bitcoin, the world's largest cryptocurrency by market capitalization and the bellwether of the cryptocurrency market, experienced at least five major price crashes: (1) in June 2011, falling 99%; (2) in August 2012, falling 56%; (3) in April 2013, falling 83%; (4) in December 2013, falling 50% (in a period of just 24 hours); and (5) in December 2018, falling 84%.  More recently, in the second quarter of 2022, the price of Bitcoin dropped 56.27% to its lowest value in over a decade.  By the end of the quarter on June 30, 2022, Bitcoin's price fell from approximately $45,000 at the start of the quarter to slightly above $19,000.

---

[1] All emphasis herein has been added unless otherwise noted.

7.      Notwithstanding the volatility of cryptocurrency, Signature Bank consistently assured investors of the soundness of its crypto-related deposits and downplayed any risks associated with its lopsided exposure to the cryptocurrency industry, claiming that the Bank was carefully managing its balance sheet and bolstering its compliance department.  On an April 2021 conference call, Defendant DePaolo stated that the Bank's deposits were "sticky"—that is, likely to be renewed or rolled over by the customer as part of the Bank's funding, including under conditions of stress, and thus beneficial to Signature Bank's balance sheet.  Ultimately, by late 2022, ***digital-asset clients represented more than one fifth of Signature Bank's deposit base***.

8.      In November 2022, the cryptocurrency exchange FTX collapsed among allegations of fraud and mishandled customer funds, resulting in a wide-ranging disruption of the cryptocurrency markets.  FTX's collapse purportedly prompted Signature Bank to begin working to reduce, to some degree, the Bank's relationship with the cryptocurrency industry.  On December 6, 2022, *Bloomberg* reported that "Signature Bank plans to continue providing banking services to cryptocurrency firms even as it seeks to remove $8 billion to $10 billion of deposits from its balance sheet," but quoted Defendant Eric Howell ("Howell"), Signature Bank's President and Chief Operating Officer ("COO"), as stating, in relevant part, that "[w]e're not exiting the space. We don't know who the winners and losers are going to be.  We don't particularly care," and "[w]e're going to be involved [in the cryptocurrency industry] but we're going to be involved in a much more thoughtful way moving forward."

9.      Then, on March 8, 2023, Silvergate Bank ("Silvergate") announced that it would voluntarily wind down its operations.  Although Silvergate cited losses suffered in its loan portfolio—a consequence of the Fed's aggressive interest rate hikes and ensuing decline in the value of U.S. Treasury securities—the collapse of FTX, a major customer, had significantly

undermined Silvergate's financial stability, as had Silvergate's lopsided exposure to the volatile cryptocurrency industry more generally. As *Bloomberg* succinctly reported on March 10, 2023, "Silvergate's demise was the result of a straightforward bet on cryptocurrencies, particularly large deposits and other business from crypto exchanges. FTX was one of the bank's largest customers."

10. Just two days later, on March 10, 2023, following a bank run, Silicon Valley Bank ("SVB") was seized by the California Department of Protection and Innovation and placed under the receivership of the Federal Deposit Insurance Corporation ("FDIC"). Whereas Silvergate was known for its relationship with the cryptocurrency industry, SVB was known for servicing the needs of the tech industry.

11. Taken together, the collapses of Silvergate and SVB, both of which were smaller banks with excessive concentration in specific industries, highlighted the specific risks associated with banks with similar concentration and liquidity profiles—*i.e.*, like Signature, given its own concentration in the cryptocurrency industry. Accordingly, in response to the two bank failures, on March 9, 2023, Signature Bank issued a press release to reiterate the supposed strength of the Bank's financial position, citing its "well-diversified financial position and limited digital-asset related deposit balances in the wake of industry developments."

12. Yet Signature Bank's reassurances proved insufficient. On March 10, 2023, given the Bank's close association with the cryptocurrency industry, Signature Bank customers withdrew **more than $10 billion** in deposits.

13. On March 12, 2023, the New York Department of Financial Services ("DFS") announced that, in order to protect depositors and pursuant to Section 606 of the New York Banking Law, DFS had taken possession of Signature Bank. DFS further stated that it was "in close contact with all regulated entities in light of market events, monitoring market trends, and

collaborating closely with other state and federal regulators to protect consumers, ensure the health of the entities we regulate, and preserve the stability of the global financial system.".

14. In a Joint Statement issued that same day (the "Joint Statement"), Federal Reserve Chair Jerome Powell, Treasury Secretary Janet Yellen, and Federal Deposit Insurance Corporation ("FDIC") Chair Martin Gruenberg, followed up on DFS's announcement. The Joint Statement announced, in relevant part, that the foregoing individuals were "announcing a [] systemic risk exception for Signature Bank [. . .] which was closed today by its state chartering authority. All depositors of this institution will be made whole. As with the resolution of Silicon Valley Bank, no losses will be borne by the taxpayer" and that "[s]hareholders and certain unsecured debtholders will not be protected. Senior management has also been removed. Any losses to the Deposit Insurance Fund to support uninsured depositors will be recovered by a special assessment on banks, as required by law."

15. Also on March 12, 2023, trading in the Bank's shares were halted, essentially rendering the Bank's shares illiquid—and, given the Bank's failure, valueless.

16. On March 20, 2023, Flagstar Bank, N.A ("Flagstar"), the wholly owned subsidiary of New York Community Bancorp Inc. ("NYCB"), acquired $12.9 billion of Signature Bank's loans and assumed $38.4 billion in deposits. Flagstar also acquired all of Signature Bank's branches, which are now operated under the Flagstar name.

17. Finally, on March 28, 2023, Signature Bank's common and preferred stock were delisted from trading on the NASDAQ Exchange ("NASDAQ").

18. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Bank's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Signature Bank had

failed to acknowledge the inherent volatility of digital-asset (*i.e.*, cryptocurrency) related deposits; (ii) accordingly, the Bank had overstated the stability and/or sustainability of its deposit base; (iii) the degree of Signature Bank's concentration in the cryptocurrency industry significantly undermined the health of its balance sheet; (iv) as a result of the foregoing, Signature Bank was exceptionally vulnerable to a bank run and/or a liquidity crisis; (v) the foregoing placed Signature Bank at a heightened risk of failure and/or regulatory takeover; and (vi) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

19.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Bank's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

20.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the United States ("U.S.") Securities and Exchange Commission ("SEC") (17 C.F.R. § 240.10b-5).

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

22.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the alleged misstatements entered and the subsequent damages took place in this Judicial District.

23.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

24.     Plaintiff, as set forth in the attached Certification, acquired Signature Bank securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

25.     Defendant Signature Bank was incorporated in New York and its head office was located at 565 Fifth Avenue, New York, New York. Signature Bank common stock and preferred stock traded on the NASDAQ until March 28, 2023, and currently trade over-the-counter, under the ticker symbols "SBNY" and "SBNYP", respectively.

26.     Defendant Shay co-founded Signature Bank and served as its Chairman of the Board at all relevant times.

27.     Defendant DePaolo co-founded Signature Bank and served as its CEO at all relevant times.

28.     Defendant Vito Susca ("Susca") served as Signature Bank's Chief Financial Officer ("CFO") from prior to the start of the Class Period until June 2021.

29.     Defendant Stephen Wyremski ("Wyremski") served as Signature Bank's CFO from June 2021 until March 12, 2023.

30.     Defendant Mark Sigona ("Sigona") served as Signature Bank's Senior Executive Vice President and COO from prior to the start of the Class Period until June 2021.

31.     Defendant Howell served as Signature Bank's President and COO from June 2021 until March 12, 2023.

32.     Defendants Shay, DePaolo, Susca, Wyremski, Sigona, and Howell are sometimes referred to herein collectively as the "Individual Defendants."

33.    The Individual Defendants possessed the power and authority to control the contents of Signature Bank's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Signature Bank's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Signature Bank, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

34.    Signature Bank and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements Issued During the Class Period

35.    The Class Period begins on April 23, 2020, when Signature Bank issued a press release announcing the Bank's Q1 2020 results.  The press release quoted Defendant Shay, stating, in relevant part:

> "As soon as the COVID-19 crisis began, we immediately recognized the nation would be in search of liquidity so we maintained extraordinarily high cash levels, which further solidifies our balance sheet. We pledge to remain a "sleep-at-night" bank for our depositors even in the midst of this crisis. We also want to assure our borrowers who may now need to draw on their lines that there is no need to draw early and pay interest as we have plenty of funds available whenever they need them. We are grateful that our clients recognize the strength of our balance sheet as in this quarter alone, they have deposited nearly $2 billion in new funds with the Bank. *We single-mindedly focus on being the safest bank, and in times like these, that makes a world of difference. We are confident that over the long-haul, our deposit base will grow and our shareholders will be rewarded for our commitment to long-term safety and soundness perspective*[.]"

36.     That same day, Signature Bank hosted an earnings call with investors and analysts to discuss the Bank's Q1 2020 results (the "Q1 2020 Earnings Call").  During the scripted portion of the Q1 2020 Earnings Call, Defendant DePaolo stated, in relevant part:

> Our colleagues have been working round the clock to ensure our clients' businesses which include many essential services are operating at full strength. We are also grateful our clients recognize the strength of our balance sheet. As in this quarter alone, they deposited nearly $1.9 billion in new funds with us. Clients view Signature Bank as a safe haven for their funds because they know we value strong capital and liquidity as a way to guarantee their security.

> All of our clients appreciate the fortitude and safety of our banking model as they have watched us flourish over the years. Our unwavering focus on organic growth and the hiring of veteran banking teams means even our newest colleagues offer expertise in their field which is complimentary to the strength of the Signature Bank management team that has always led this bank forward.

37.     On July 21, 2020, Signature Bank issued a press release announcing the Bank's Q2 2020 results.  The press release quoted Defendant Shay, stating, in relevant part:

> "These unprecedented times reveal the strength of our client relationships. ***As with the 2007-2009 financial crisis -- first and foremost -- clients must be confident in knowing they have a trusted advisor, such as a bank that will leave no stone unturned when supporting them; one which ensures sleep-at-night safety for their funds. Signature Bank has proven its place as this type of institution, time and again; possibly more so now than ever.*** Our private client bankers and senior management team have been in constant contact with clients as the current economic situation unfolded and unexpectedly impacted their businesses. Furthermore, we put forth a major effort on behalf of our clients, working closely with them on the PPP process to enable eligibility for accessing these funds. ***We are extremely proud of our colleagues' dedication, as they worked diligently to get this right. Clients noticed and appreciated this level of performance, which further validated how Signature Bank is a safe repository for their hard-earned monies and a fortress for their funds. We know we are better together and prosper as our clients prosper***[.]"

38.     That same day, Signature Bank hosted an earnings call with investors and analysts to discuss the Bank's Q2 2020 results (the "Q2 2020 Earnings Call").  During the scripted portion of the Q2 2020 Earnings Call, Defendant DePaolo stated, in relevant part:

This was truly an exceptional quarter where we witnessed strong performances across the entire Bank. We are great [technical difficulty] recognize the strength of our balance sheet, having already deposited nearly $10 billion in new funds this year. During difficult times, our high-touch service model truly differentiates us. We maintain steady contact with our clients informing them of new developments; such as PPP, which led to strengthening of our client relationships.

Furthermore, we never lose sight of the fact that people want to know their funds are safe in difficult times. As with past crisis, we want to assure you management remains dedicated to guiding the Bank through this unsettling times.

We'll focus on the soundness of our conservative risk management and capital allocation practices, ensuring the safety of our nearly 1,600 colleagues and their families and supporting our clients by meeting their needs. The safety and health of all stakeholders remains paramount to our franchise as we navigate the times ahead.

39.     On October 20, 2020, Signature Bank issued a press release announcing the Bank's

Q3 2020 results.  The press release quoted Defendant DePaolo, stating, in relevant part:

"Signature Bank continues to realize extraordinary growth during a protracted and challenging recovery from the COVID-19 pandemic. Our founding business philosophy to provide a client-centric, single point-of-contact model led by experienced group directors still distinguishes Signature Bank in the marketplace, particularly in times of distress. ***We've successfully navigated many challenges before and inevitably there will be others. While we don't always know when or in what form they will materialize, we always knew it was important to be well diversified. As expected, our new initiatives are being embraced by clients, allowing us to continue to deliver solid results during these unsettling times***[.]"

40.     On January 21, 2021, Signature Bank issued a press release announcing the Bank's

Q4 and full year 2020 results.  The press release quoted Defendant Shay, stating, in relevant part,

that "part of being a safe bank amid this landscape is paying close attention to technological

advances. We have been at the forefront, as evidenced by the first to launch a blockchain-based

payments platform, and we intend to keep it that way. Hence the reason we invested in developing

Signet[,] [the Bank's real-time crypto payments platform,] before most investors -- and even our

clients -- recognized the emergence of and massive changes in the digital payments economy."

41.     That same day, Signature Bank hosted an earnings call with investors and analysts
to discuss the Bank's Q4 and full year 2020 results (the "Q4 2020 Earnings Call").  During the
Q&A portion of the Q4 2020 Earnings Call, when asked about the services that Signature Bank
offered to cryptocurrency firms and the resulting deposit growth in digital banking related to those
firms, Defendant Howell responded:

> Well, there is a number of different types of clients, whether it's stable client or
> OTC [ph] or digital asset exchanges or blockchain type tech companies and others
> that we bank in that space. So we have approaching -- ***I think we just crossed over
> $10 billion in deposits with our digital asset team; so it's been a very solid area
> of growth, we've clearly become the pre-eminent player in that space.*** So we're
> very excited about what's happening there***. It's obvious that the digital assets and
> cryptocurrencies are not going away, and they are something in the future, we're
> not sure who the winners and losers are going to be, but we're very happy that
> we're -- the bank for all those various firms.***

42.     On April 21, 2021, Signature Bank issued a press release announcing the Bank's
Q1 2021 results.  The press release quoted Defendant Shay, stating, in relevant part:

> "Throughout this year-long pandemic, Signature Bank kept its focus and remained
> committed to our sleep-at-night safety for depositors and single point of contact
> service model. It is no mystery why the Bank has grown so rapidly during this past
> year. We always scrutinize the financial service horizon to attempt to stay one step
> ahead of the pack. ***Our commitment to the still-nascent emerging digital asset
> space is just one example, as evidenced by the ongoing embracing of our
> payments platform, Signet™. Change is a constant in banking, and we will
> remain nimble while never straying from our twin pillars of providing depositor
> safety and a single point of contact approach to our loyal clients***."

43.     That same day, Signature Bank hosted an earnings call with investors and analysts
to discuss the Bank's Q1 2021 results (the "Q1 2021 Earnings Call").  During the Q&A portion of
the Q1 2021 Earnings Call, when asked to discuss Signature Bank's ability to deploy crypto-related
deposits into longer-duration assets, and the rate-sensitivity of those deposits in a higher rate
environment, Defendant DePaolo responded, in relevant part:

> Well, 30% of the digital deposits are usually in [demand deposit accounts] because
> we're getting the operating accounts. So I think it's important to understand, just

like all our other businesses, that our clients are in, the key thing is to have their operating accounts and tie them in to making it difficult to leave, and we give great performance, great support for the clients' operating accounts.

Now within digital, we're in all different areas of digital. We do stable coin reserves, we're dealing with the OTC desks, the clients' digital asset exchanges, blockchain technology, digital miners and that we have those that use Signet and then we have some of the traditional. So within digital, we have a mix shift. And outside of digital, we have a mix shift because of all the businesses. ***So we feel that they're fairly sticky deposits***. I know it's early on, but we have a team -- we have 2 teams, 1 that handles Signet, 1 that handles the clients and tries to get the business into the institution. And that team has been around for over 8 years, and they have a knowledge base and they're a key into getting these actual operating accounts. ***So we feel the stickiness is there***.

We've been asked what about the competition, like the big banks, the Chases and the Cities, if they get into digital in a big way? Well, we've been competing with them for 20 years. So we're not worried about the big players, ***nor are we worried about the stickiness of the deposit***.

44.    On July 20, 2021, Signature Bank issued a press release announcing the Bank's Q2 2021 results.  The press release quoted Defendant Shay, stating, in relevant part:

"Signature Bank continues to fire on all cylinders as we stay true to our core principles of providing relationship-based, client-centric service and sleep-at-night safety. While our deposit growth has been truly extraordinary, we remain prudent in the deployment of new funds. We believe the value of building long-term client relationships is most important to sustaining our growth, which is what we encourage our long-term investors to remember. It is always a distinct pleasure to hear so many clients compliment the service of individual colleagues or banking groups for providing positive, prompt and diligent service. This has been our core differentiator, since inception and all along the way, as we built this enterprise organically.

It is also prudent for Signature Bank to maintain its focus on leading and experimenting with the newest technologies in a disciplined yet vigorous manner. In an era of rapid technological change in the financial and payments world, we are on the cutting-edge of adoption and expansion of our digital assets business, especially since the launch of Signet™, our blockchain-based payments platform.

We have always been - and continue to be - willing to do things differently and embrace change, which has not gone unnoticed by our clients, colleagues or investors."

45.     On October 19, 2021, Signature Bank issued a press release announcing the Bank's

Q3 2021 results.  The press release stated, in relevant part:

> As Signature Bank surpasses the $100 billion mark, I feel compelled to reflect on what we have accomplished. Since our founding in 2001, and throughout the past several quarters in particular, the Bank realized dramatic growth. ***This was driven by the collective success of our legacy banking teams in New York, our blockchain-based payments platform, Signet™, and the many low-risk franchises which now comprise our organization. The deposit growth of $10.00 billion in the third quarter continued to be widespread, with notable contributions from our Digital Assets Banking team, including growth on the Signet™ platform***, the Specialized Mortgage Banking Solutions team, and the New York-based legacy banking teams. Our core loan growth, driven by our Fund Banking Division, grew a record $5.01 billion in outstandings. Although some of these businesses have only recently come to fruition, our approach remained consistent since the day we opened our doors. We've always adhered to our client-centric, single-point-of-contact model, which invariably attracts top bankers from across the industry as well as their clients," said [Defendant] DePaolo.
>
> ***
>
> [Defendant Shay] added: "We started as a bank with $50 million in assets, and now, just 20 years later, passed the $100 billion mark purely organically. We believe there is no bank in the history of the U.S. that has grown organically to $100 billion on an inflation-adjusted basis in the same time frame. Organic growth in our case equates to every single banker choosing to work with us and their clients electing to follow them along with many new clients who came to the bank from elsewhere because they heard of our great service and focus on safety. We have not inherited any clients or had legacy ones since we founded the institution ourselves. ***Clients trust us, and we don't take their trust lightly. We remain committed to providing sleep-at-night safety for our depositors while providing exceptional service. In addition, we continue to identify emerging, safe technologies to afford our clients the ability to transact their business ever more efficiently***. We truly believe that the best is yet to come for Signature Bank."

46.     That same day, Signature Bank hosted an earnings call with investors and analysts

to discuss the Bank's Q3 2021 results (the "Q3 2021 Earnings Call").  During the Q&A portion of

the Q3 2021 Earnings Call, when asked to discuss potential regulatory changes related to digital

deposits, Defendant Howell responded, in relevant part:

> [T]here's a lot that has to be done in the U.S. as it relates to regulations around financial technology, and we certainly appreciate that and understand that, where

we are already highly regulated, and we ultimately expect that fintechs and others will need regulation as well, and we welcome that, right? ***For us, the DFS -- the New York DFS have been really strong supporters. And they have a team that's well versed in crypto and they work really well with us***, and hopefully, they'll continue to do that with others as well.

47.     On April 19, 2022, Signature Bank hosted an earnings call with investors and analysts to discuss the Bank's Q1 2022 results (the "Q1 2022 Earnings Call").  During the scripted portion of the Q1 2022 Earnings Call, Defendant DePaolo stated, in relevant part:

> On the digital front, we are seeing tremendous positive momentum. The business continues to grow, as evidenced by the on-boarding of a record 160 new clients. Also, we doubled the amount of major exchanges to eight of the top 12 where we are now the primary bank, which should bode well for future growth. All of these exchanges are integrating on to Signet in part due to our latest enhancement. This new feature allows for our clients to execute automated Fed wires from within Signet in addition to blockchain-based payments, creating efficiency for our clients and streamlining their payments process. As one of the leading banks in this space, we listened to our clients and developed Signet into an all-in-one payment solution.

48.     In addition, during the Q&A portion of the Q1 2022 Earnings Call, when asked to discuss the "next leg" of growth in the crypto exchange customer segment, Defendant DePaolo responded, in relevant part, "[w]ell, we do institutional, we really don't do client, personal client, we do institutional. I think just trying to bring on more of those exchanges at least in the near term, the fact that we went through four being the primary bank to eight being the primary bank, that should give us some--a lot of runway to grow during this year."

49.     In the second quarter of 2022, the price of Bitcoin, the bellwether of the cryptocurrency industry, dropped 56.27% to its lowest price in over a decade.  Indeed, by the end of the quarter on June 30, 2022, Bitcoin's price fell from approximately $45,000 at the start of the quarter to slightly above $19,000.  Nevertheless, Signature Bank continued to tout the profitability of the crypto industry and to reiterate to investors that the Bank maintained a strong financial position.

50.     On July 19, 2022, Signature Bank issued a press release announcing the Bank's Q2 2022 results. The press release quoted Defendant Shay, stating, in relevant part:

> "We built Signature Bank for times of volatility and uncertainty like those of today. Accordingly, our clients have come to continually appreciate our strong balance sheet, which emphasizes depositor safety more than anything else. Our investment portfolio is built around low-risk highly liquid securities, and our lending efforts are also centered around lower risk arenas. This depositor safety-first philosophy led to us being the only bank in the U.S. with more than $4 billion in assets to escape the Great Financial Crisis without a down year in earnings. In times like these, we are able to seize opportunities that build our business as we endeavor to onboard new clients and attract new teams. We have always stayed firm on serving our clients through our relationship-based, single-point-of-contact team approach, which has become the hallmark of our enterprise. These are among the reasons we believe Signature Bank will continue to grow and prosper."

51.     That same day, Signature Bank hosted an earnings call with investors and analysts to discuss the Bank's Q2 2022 results (the "Q2 2022 Earnings Call"). During the Q&A portion of the Q2 2022 Earnings Call, when asked to discuss how the Q2 2022 disruptions in the cryptocurrency markets impacted Signature Bank's digital asset client acquisition, Defendant Howell responded, in relevant part:

> Well, clients were up 121 clients. So, we had a very good quarter there. We are at 1,323 in total. I think, we've got strong -- it was our best transfer volume over $254 billion. So, it was a really strong quarter from a client acquisition standpoint. ***So, we're seeing more and more people come into the space, which will bode well***. We onboarded a few more exchanges that have met to move over their relationships, so that will bode well for us in the future also. But, clearly, people -- deposits have exited and have ***exited to a pretty small extent though when you think about it***, Steve, like I said, given the value decline there.

52.     On October 18, 2022, Signature Bank issued a press release announcing the Bank's Q3 2022 results. The press release quoted Defendant Shay, stating, in relevant part:

> "It is during tumultuous times that Signature Bank's strengths really stand out. Our Group Directors and National Banking Practice Leaders act as trusted advisors to our clients and foster a feeling that we are all in it together.

> "As [Defendant DePaolo] alluded to, the Bank put several long-term strategies in place to grow its business and serve more clients. To this end, our innovations in

the digital world with our Signet™ payments platform helped our clients better operate their businesses. As the payment space further evolves, so will Signature Bank, ensuring our clients and shareholders benefit from new developments.

"Our technology advancements, client retention and expansion and business diversification all contributed to the $114.47 billion in assets we reached in the third quarter. These efforts, coupled with exceptional returns on capital, excellent credit metrics and an emphasis on safe, less risky assets, continues to shape the future successes of Signature Bank."

53.     That same day, Signature Bank hosted an earnings call with investors and analysts to discuss the Bank's Q3 2022 results (the "Q3 2022 Earnings Call").  During the Q&A portion of the Q3 2022 Earnings Call, when asked to discuss the Bank's growth in the digital deposit and crypto space, Defendant DePaolo responded, in relevant part:

It seems like it's somewhat stabilizing. They've been in this winter crypto for over a year now. And sooner or later, it's time to get out. And we're probably seeing positive things going on for us. So that when it does dissipate, we'll have -- we'll be ready, just like with all our other businesses. Like Eric said, in commercial real estate, we deal with the best of the best. In digital, we turn down more clients or potential clients than we bring on clients, because of all the due diligence that we do because we want to deal with the best of the best. And what put us in the advantage on the digital side was that we had a team that has been doing it five years before they came to join us one year ago. So we're feeling pretty good about is, we are not making any prediction.

54.     In November 2022, the cryptocurrency exchange FTX collapsed among allegations of fraud and mishandled customer funds, resulting in a wide-ranging disruption of the cryptocurrency markets.  FTX's collapse purportedly prompted Signature Bank to begin working to reduce, to some degree, the Bank's relationship with the cryptocurrency industry.

55.     On November 15, 2022, Signature Bank issued a press release providing a digital asset banking update.  The press release stated, in relevant part:

Signature Bank [. . .] announced today a digital asset banking update, citing that its deposit relationship with FTX and their related companies is less than 0.1 percent of the Bank's overall deposits as of November 14, 2022.

Signature Bank only has a deposit relationship with FTX. Additionally, the Bank does not lend on digital assets (cryptocurrencies), invest in digital assets or custody any digital assets for any of its clients. Signature Bank's relationships in the digital asset space can be characterized as traditional deposit banking, including cash and treasury management services to institutional entities.

As of November 14, 2022, the Bank's deposit balances in the digital asset arena remained stable when compared with balances of $23.5 billion at September 30, 2022.

"***Signature Bank is a well-diversified institution that employs appropriate risk management strategies that help us navigate the current challenging digital asset landscape. Our strong capital, solid earnings and overall diversification, continues to provide a source of strength for our depositor clients***[.]" stated [Defendant DePaolo]

56.     Similarly, on December 6, 2022, *Bloomberg* reported that "Signature Bank plans to continue providing banking services to cryptocurrency firms even as it seeks to remove $8 billion to $10 billion of deposits from its balance sheet," but quoted Defendant Howell as stating, in relevant part, "[w]e're not exiting the space.  We don't know who the winners and losers are going to be.  We don't particularly care," and "[w]e're going to be involved [in the cryptocurrency industry] but we're going to be involved in a much more thoughtful way moving forward."

57.     On January 17, 2023, Signature Bank issued a press release announcing the Bank's Q4 and full year 2022 results.  The press release quoted Defendant DePaolo, stating, in relevant part:

"At the onset of 2022, we set several goals, including the hiring of numerous private client banking teams and hundreds of colleagues to support our geographic expansion; increasing annual earnings to a record level; and, growing both our loan and deposit portfolios substantially. Most of these were met. During the 2022 second quarter, our newest national business line, the Healthcare Banking and Finance team, was launched. Throughout the year, 12 private client banking teams were onboarded, 3 of which in Nevada, marking the Bank's entry into the state. To support this team growth, we added hundreds of colleagues across various operational and support areas. Although we grew loans by a strong $9.43 billion, 2022 presented deposit challenges. While we expected to see continued deposit growth, albeit not at 2020 or 2021 levels, seven Fed rate hikes during 2022 totaling 425 basis points, coupled with quantitative tightening and the proliferation of off

balance sheet alternatives, resulted in the most difficult deposit environment we have seen in our 22-year history. ***The arduous rate environment, along with challenges in the digital asset space, led to deposit declines, which we overcame with little difficulty, given our robust liquidity position***. Despite these deposit headwinds, we still earned record net income of $1.34 billion and a record return on common equity of 16.35 percent for the year[.]"

58.     On March 2, 2023, Signature Bank issued a press release linking to a presentation that gave a Mid-Quarter Financial Update (the "March 2 Update").  The March 2 Update stated that "[t]he average balance quarter-to-date is $88.79 billion, which is higher than the December 31, 2022 balance of $88.59 billion, and lower than the fourth quarter 2022 quarter-to-date average balance of $98.6 billion."  The presentation also stated that "[d]eposits have increased $682 million thus far this quarter, excluding digital asset client related balances" and "[t]he decrease in deposit balance this quarter has been driven by the deliberate decline in digital asset client related deposits of $1.51 billion, as the Bank continues to reduce the size of deposit relationships in this space."

59.     Then, on March 8, 2023, Silvergate announced that it was voluntarily winding down its operations.  Although Silvergate cited losses suffered in its loan portfolio—a consequence of the Fed's aggressive interest rate hikes and the ensuing fall in the value of U.S. Treasury securities—Silvergate's financial stability was significantly undermined by the collapse of FTX, a major customer, as well as the Bank's lopsided exposure to the volatile cryptocurrency industry more generally.  As *Bloomberg* succinctly reported on March 10, 2023, "Silvergate's demise was the result of a straightforward bet on cryptocurrencies, particularly large deposits and other business from crypto exchanges.  FTX was one of the bank's largest customers.

60.     Just two days later, on March 10, 2023, following a bank run, SVB was seized by the California Department of Protection and Innovation and placed under the receivership of the FDIC.  Whereas Silvergate was known for its relationship with the cryptocurrency industry, SVB was known for servicing the needs of the tech industry.

61.     Taken together, the collapses of Silvergate and SVB, both of which were smaller banks with excessive concentration in specific industries, highlighted the specific risks associated with banks with similar concentration and liquidity profiles—like Signature, given its own exposure to the cryptocurrency industry.  Accordingly, in response to the two bank failures, on March 9, 2023, Signature Bank issued a press release titled "Signature Bank Issues Updated Financial Figures as of March 8, 2023; Reiterates Strong Financial Position and Limited Digital-Asset Related Balances in Wake of Industry Developments" (the "March 9 Update").  The March 9 Update was intended to calm investors and depositors in the wake of chaos in the banking sector, such as the collapse of Silicon Valley Bank, and stated, in relevant part:

> Signature Bank [. . .] announced today updated financial figures as of March 8, 2023 and reiterated its strong, well-diversified financial position and limited digital-asset related deposit balances in the wake of industry developments.
>
> To this end, Signature Bank has:
>
> - A proven, stable commercial banking business model with in excess of $100 billion in well-diversified assets across nine national business lines and nearly 130 commercial banking teams spanning its metropolitan New York area and West Coast footprint;
> - A diversified deposit mix, with more than 80 percent of deposits coming from middle market businesses, such as law firms, accounting practices, healthcare companies, manufacturing companies and real estate management firms;
> - A high level of capital as evidenced by a common equity tier 1 risk-based capital ration of 10.42 percent, which is well in excess of regulatory requirements, as of year-end 2022;
> - Investment-grade long- and short-term credit ratings, which were recently affirmed by Fitch Ratings, Kroll Bond Rating Agency (KBRA) and Moody's Investors Services; and,
> - A strong liquidity position, with the following financial balances (unaudited) as of March 8, 2023:
>   - Cash held on balance sheet of approximately $4.54 billion
>   - Borrowing balances (excluding subordinated debt) of $6.58 billion, with additional capacity of approximately $29.01 billion
>   - Marketable liquid securities of approximately $26.41 billion
>   - Deposit balances of $89.17 billion, which are up $576 million since year-end 2022. This includes the deliberate reduction in digital

asset-related client deposits of $1.27 billion, resulting in a balance of $16.52 billion in digital asset-related client deposits

o Loan balances of $71.81 billion, which are lower by $1.99 billion since year-end 2022, as the Bank executes on its previously announced strategy to reduce loan balances in its larger business lines; and,

• Over the course of this week and thus far for the quarter, we have repurchased $55.0 million of common stock within our previously disclosed share repurchase authorization.

Furthermore, in January 2023, the Bank announced a 25 percent increase in its common stock dividend to $2.80 per share annually, the first increase since the dividend was established in 2018.

\*\*\*

"We want to make it clear again that Signature Bank is a well-diversified, full-service commercial bank with more than two decades of history and solid performance serving middle market businesses. ***We have built a strong reputation serving commercial clients through nine business lines and reached in excess of $100 billion in assets by continually executing our single-point-of-contact, relationship-based model where banking teams are capable of meeting all client needs***," said [Defendant] DePaolo[.]

"As a reminder, Signature Bank does not invest in, does not trade, does not hold, does not custody and does not lend against or make loans collateralized by digital assets," [Defendant] DePaolo concluded.

"We have repeatedly communicated that our relationships in the digital asset space are limited to U.S. dollar deposits only, and we remain fully committed to executing on our plan to deliberately reduce these deposits further. Since we opened our doors, we have been a 'deposit-first' institution and have always been committed to our depositors' safety, first and foremost. ***As shown by our current metrics, we intentionally maintain a high level of capital, strong liquidity profile and solid earnings, which continues to differentiate us from competitors, especially during challenging times***," added [Defendant] Howell.

62.     Yet Signature Bank's reassurances proved insufficient.  On March 10, 2023, given the Bank's close association with the cryptocurrency industry, Signature Bank customers withdrew ***more than $10 billion*** in deposits.

63.     The statements referenced in ¶¶ 35-48, 50-53, 55, 57-58, and 61 were materially false and misleading because Defendants made false and/or misleading statements, as well as

failed to disclose material adverse facts about the Bank's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Signature Bank had failed to acknowledge the inherent volatility of digital-asset (*i.e.*, cryptocurrency) related deposits; (ii) accordingly, the Bank had overstated the stability and/or sustainability of its deposit base; (iii) the degree of Signature Bank's concentration in the cryptocurrency industry significantly undermined the health of its balance sheet; (iv) as a result of the foregoing, Signature Bank was exceptionally vulnerable to a bank run and/or a liquidity crisis; (v) the foregoing placed Signature Bank at a heightened risk of failure and/or regulatory takeover; and (vi) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

### **The Truth Emerges**

64.     On March 12, 2023, DFS issued a press release entitled "Superintendent Adrienne A. Harris Announces New York Department of Financial Services Takes Possession of Signature Bank."  The press release stated, in relevant part:

> Superintendent Adrienne A. Harris announced today that the New York Department of Financial Services (DFS) has taken possession of Signature Bank, pursuant to Section 606 of New York Banking Law, in order to protect depositors. DFS appointed the Federal Deposit Insurance Corporation (FDIC) as receiver of the bank.

> Signature Bank is a New York state-chartered commercial bank and is FDIC-insured, with total assets of approximately $110.36 billion and total deposits of approximately $88.59 billion as of December 31, 2022.

> DFS is in close contact with all regulated entities in light of market events, monitoring market trends, and collaborating closely with other state and federal regulators to protect consumers, ensure the health of the entities we regulate, and preserve the stability of the global financial system.

65.     Section 606 of New York Banking Law states, in pertinent part, "[t]he Superintendent may, in his discretion, forthwith take possession of the business and property of any banking organization whenever it shall appear that such banking organization:

(a) has violated any law;
(b) is conducting its business in an unauthorized or unsafe manner;
(c) *is in an unsound or unsafe condition to transact its business*;
(d) *Cannot with safety and expediency continue business*;
(e) *Has an impairment of its capital; or, in the case of a mutual savings and loan association or credit union, has assets insufficient to pay its debts and the amount due members upon their shares*;
(f) Has suspended payment of its obligations; or, in the case of a mutual savings and loan association, has failed for sixty days after a withdrawal application has been filed with it by any shareholder to pay such withdrawal application in full;
(g) Has neglected or refused to comply with the terms of a duly issued order of the superintendent;
(h) Has refused, upon proper demand, to submit its records and affairs for inspection to an examiner of the department;
(i) Has refused to be examined upon oath regarding its affairs;
(j) Has neglected, refused or failed to take or continue proceedings for voluntary liquidation in accordance with any of the provisions of this chapter."

66.     As a result of the specific circumstances in which the DFS Superintendent may, in his or her discretion, take possession of a bank, the March 2 and March 9 Updates did not provide investors with a full picture of the risks facing Signature Bank, or hint that it might be taken over by DFS.

67.     In a Joint Statement issued that same day, Federal Reserve Chair Jerome Powell, Treasury Secretary Janet Yellen, and FDIC Chair Martin Gruenberg, followed up on DFS's announcement.  The Joint Statement provided, in relevant part:

Today we are taking decisive actions to protect the U.S. economy by strengthening public confidence in our banking system. This step will ensure that the U.S. banking system continues to perform its vital roles of protecting deposits and providing access to credit to households and businesses in a manner that promotes strong and sustainable economic growth.

\*\*\*

[In addition to providing a systemic risk exception for SVB Financial Group], [w]e are also announcing a similar systemic risk exception for Signature Bank, New York, New York, which was closed today by its state chartering authority.  All depositors of this institution will be made whole.  As with the resolution of Silicon Valley Bank, no losses will be borne by the taxpayer.

***Shareholders and certain unsecured debtholders will not be protected.  Senior management has also been removed.  Any losses to the Deposit Insurance Fund to support uninsured depositors will be recovered by a special assessment on banks, as required by law***.

68.     Also on March 12, 2023, trading in the Bank's shares were halted, essentially rendering the Bank's shares illiquid—and, given the Bank's failure, valueless.

69.     On March 20, 2023, Flagstar, the wholly owned subsidiary of NYCB, acquired $12.9 billion of Signature Bank's loans and assumed $38.4 billion in deposits.  Flagstar also acquired all of Signature Bank's branches, which are now operated under the Flagstar name.

70.     Finally, on March 28, 2023, Signature Bank's common and preferred stock were delisted from trading on the NASDAQ.

71.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Bank's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

72.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Signature Bank securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Bank, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

73.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Signature Bank securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Signature Bank or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

74.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

75.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

76.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Signature Bank;

- whether the Individual Defendants caused Signature Bank to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Signature Bank securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

77.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

78.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Signature Bank securities are traded in an efficient market;

- the Bank's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Bank traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Bank's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Signature Bank securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

79.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

80.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v.*

*United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

81.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

82.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

83.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Signature Bank securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Signature Bank securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

84.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described

above, including statements made to securities analysts and the media that were designed to influence the market for Signature Bank securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Signature Bank's finances and business prospects.

85.     By virtue of their positions at Signature Bank, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

86.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Signature Bank, the Individual Defendants had knowledge of the details of Signature Bank's internal affairs.

87.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Signature Bank.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Signature Bank's businesses, operations, future financial condition and future prospects.  As a

result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Signature Bank securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Signature Bank's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Signature Bank securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

88.     During the Class Period, Signature Bank securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Signature Bank securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Signature Bank securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.   The market price of Signature Bank securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

89.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

90.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Bank's securities during the Class Period, upon the disclosure that the Bank had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

91.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

92.     During the Class Period, the Individual Defendants participated in the operation and management of Signature Bank, and conducted and participated, directly and indirectly, in the conduct of Signature Bank's business affairs.  Because of their senior positions, they knew the adverse non-public information about Signature Bank's misstatement of income and expenses and false financial statements.

93.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Signature Bank's financial condition and results of operations, and to correct promptly any public statements issued by Signature Bank which had become materially false or misleading.

94.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Signature Bank disseminated in the marketplace during the Class Period concerning Signature Bank's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Signature Bank to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of

Signature Bank within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Signature Bank securities.

95.     Each of the Individual Defendants, therefore, acted as a controlling person of Signature Bank.  By reason of their senior management positions and/or being directors of Signature Bank, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Signature Bank to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Signature Bank and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

96.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Signature Bank.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated:  March 31, 2023

Respectfully submitted,

POMERANTZ LLP

*/s/ J. Alexander Hood II*
J. Alexander Hood II
Jeremy A. Lieberman
Emma Gilmore
Thomas H. Przybylowski
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
ahood@pomlaw.com
jalieberman@pomlaw.com
egilmore@pomlaw.com
tprzybylowski@pomlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, Pirthi Pal Singh, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against Signature Bank ("Signature Bank") and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire Signature Bank securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Signature Bank securities during the Class Period as specified in the Complaint, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of my transactions in Signature Bank securities during the Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.      I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

**Executed** <u>3/17/2023</u>
            **(Date)**

DocuSign by:

<u>_____</u>
**(Signature)**  EB5AA937312146D...

<u>Pirthi Pal Singh_____</u>
**(Type or Print Name)**

**Signature Bank (SBNY)**                                                    **Pirthi Pal Singh**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 2/2/2022 | 31.91981 | $313.2900 |
| Purchase | 2/14/2022 | 29.52977 | $338.6400 |
| Purchase | 2/23/2022 | 25.19088 | $339.2100 |
| Purchase | 3/1/2022 | 31.71079 | $315.3500 |
| Purchase | 3/1/2022 | 25.28849 | $313.9700 |
| Purchase | 3/1/2022 | 40.12830 | $314.2500 |
| Purchase | 3/4/2022 | 48.85037 | $304.4200 |
| Purchase | 3/23/2022 | 43.47461 | $297.4000 |
| Purchase | 3/23/2022 | 90.03193 | $294.3400 |